AUSTIN *v.* THE MOST WORSHIPFUL GRAND LODGE
F. &. A. MASONS.

4-5969 141 S. W. 2d 7

Opinion delivered May 27, 1940.

*A. D. DuLaney* and *Scipio A. Jones,* for appellants.

*Danaher & Danaher,* for appellees.

HOLT, J. June 27, 1887, appellee, The Most Worshipful Grand Lodge of Ancient Free and Accepted Masons of the State of Arkansas (hereinafter referred to as the Grand Lodge), was incorporated and chartered under § 2252 *et seq.* of Pope's Digest, and since has existed as a colored Grand Lodge.

October 1, 1891, it established, as a part of its beneficial work, what it was pleased to call the Masonic Benefit Association, which existed as its insurance branch until in March, 1933.

There had accumulated in what is called the mortuary fund of the Masonic Benefit Association (the insurance branch) a substantial amount of cash and securities. At different times up to 1932 the Grand Lodge had borrowed, or used, from these insurance funds a total of $32,000.

May 24, 1932, the Grand Lodge, in compliance with the State Insurance Commissioner's order that the benefit Association take security for its debt, executed its note secured by a deed of trust on its temple building property in Pine Bluff, Arkansas, for the above sum, and subsequently on February 27, 1933, by permission of the Insurance Commissioner it was permitted to take up the above note and issue sixteen new notes for $2,000 each and secured by a new deed of trust on the above property in which J. H. Blount was named trustee.

July 9, 1935, appellee, Grand Lodge, and the other appellees, filed suit against the trustee, Blount, the Ma-

sonic Benefit Association and J. S. Phelix, receiver of the Association, to cancel the notes executed in 1933 and the mortgage securing the same. In their complaint, among other things they alleged in substance that The Grand Lodge is the owner of lot three (3), block forty (40), in Pine Bluff, Arkansas, upon which it erected and has maintained a four-story Temple building and store buildings; in 1933, Phelix, who was then the Grand Master of the Grand Lodge, contriving to defraud the Lodge, caused a suit to be commenced in the circuit court of Crittenden county by the Attorney General, to restrain the Lodge and the Benefit Association from carrying on business, to revoke its charter and license, and to have himself appointed as receiver to distribute its assets.

They alleged that Phelix, without notice to any member of the lodge, on March 15, 1933, signed a waiver of a hearing before the Attorney General, admitted the insolvency of the Association and agreed that a suit might be instituted for the appointment of a receiver, which was done. The court appointed Phelix as receiver and authorized him to sell the assets of the Association and to execute a mortgage upon the Temple building in Pine Bluff for $32,000, which Phelix falsely represented to the court was due by the Grand Lodge to the Benefit Association. That Phelix, without any authority, executed the mortgage in the name of the Lodge and attempted to convey to J. H. Blount as trustee this real estate, to secure the payment of $32,000 to the Association, this sum being evidenced by sixteen notes, payable $2,000 annually at 5 per cent. interest, commencing February 27, 1934; that Reed, the Grand Secretary of the Grand Lodge, signed these instruments, under the mistake and belief and false representation of Phelix, that it was his duty to sign the same under the orders of the court; that the Grand Lodge is an association of Masonic lodges and, as a charitable measure for the benefit of the members, it provided a fund to be paid to the widows and orphans or the legal representatives of each Master Mason of subordinate lodges in good standing at his death. Funds were paid in as dues by the members, and the Grand Lodge, through its Grand Master and Grand Secretary,

issued to each member a certificate under the seal of the Lodge, amounting to $200, payable 30 days after proof of death. In the resolution passed by the Grand Lodge providing for such funds, it was called the Masonic Benefit Association, but it is not in fact a separate entity from the Grand Lodge.

They alleged that the Grand Lodge by § 7 of its Acts of 1901, passed the following: "The Board of Trustees shall have no power to borrow money or in any way contract any debts of any kind whatever in the name of this Grand Lodge for which there is not in the hands of the Grand Treasury the money to promptly pay same before any and all debts contracted"; that the Grand Lodge never conferred any power upon Phelix as Grand Master or Reed as Grand Secretary, to execute the deed of trust to Blount, trustee, and the execution thereof was without authority of law and it is invalid; that it casts a cloud upon the title to the land and prevents the Grand Lodge from selling, encumbering or otherwise dealing with its property; that the Grand Lodge received no consideration for the notes and deed of trust and they should be surrendered and canceled, and prayed that deed of trust and notes be held void and canceled.

Appellant, Phelix, as receiver, filed separate answer denying every material allegation in the complaint adverse to his interest as receiver and affirmatively alleged that the suit for receivership was well known to the Grand Lodge and its officers; that he executed bond as receiver for $10,000 as required by the court that the $32,000 in notes and the mortgage sought to be canceled were a part of the assets of the Benefit Association at the time he was appointed receiver and came into his possession upon execution of his bond; that the debt of $32,000 then existed and was owing to the Benefit Association; that the Association had a large income from the dues accumulated for the payment of death benefits and the Grand Lodge had borrowed $32,000 thereof, for which it executed its notes and the deed of trust in question, with authority, and prayed that the complaint be dismissed.

Three separate interventions, each on behalf of a large number of interested parties, were filed. However, for the purposes of this opinion, the intervention of appellant, Alford Austin, only, will be referred to, other interventions being of same nature. This intervention contains many pages in the abstract and is too long to set out here. Its substance, however, is that the interveners are beneficiaries under policies or certificates of deceased members issued by the Grand Lodge and its Benefit Association and ask permission of the court to intervene herein for the protection of their express interest in the deed of trust sought to be canceled. They are citizens of this state and appear for themselves and others similarly situated; that all Master Masons of local lodges were required to carry insurance and benefit certificates, and their deceased policyholders held death and burial certificates issued by the Grand Lodge and signed by the Grand Master and Grand Secretary under seal, and they paid quarterly dues or premiums each year as required by the Grand Lodge; that the Masonic Benefit Association, as it was called, was governed by the Grand Master and Grand Secretary and certain members elected by the Grand Lodge (the Masonic Benefit Board) and constituted, and was the Fraternal Insurance or Benefit Department of the Grand Lodge and a part thereof; that J. H. Blount, the trustee in the deed of trust sought to be canceled by the plaintiffs, was Secretary of this Benefit Board, while it was in existence. Blount died in the early part of the year 1939 and there is now no trustee under said deed of trust.

They alleged that the Masonic Benefit Association is made a defendant herein, and, if it is part of the plaintiff, Grand Lodge, the plaintiff cannot sue part of itself: that Phelix, receiver, who was made a defendant, is not now receiver of the Benefit Association and has not been since 1936, and there is now no receiver or any receivership pending in any court against the Association; that if the petitioning interveners (death beneficiaries) are not allowed to intervene and protect their interests, they will not be protected and the Grand Lodge will secure the cancellation of the note and deed of trust

and fail to comply with the terms thereof, and will defeat the claims of interveners; that these interveners are poor and without means to individually prosecute suits on their claims in this or any other court, and their rights will be entirely lost if redress is not had in the chancery court.

They alleged that the Grand Lodge has not paid or attempted to pay any beneficiary upon death claims without litigation since the beginning of the year 1933, and has sought, and is seeking to defeat the just and proven claims of these beneficiaries, and to cancel the note and deed of trust which inures and belongs to these interveners; that the individuals, Jones, Coleman, Taylor and Reed, have no right to prosecute this action and no cause of action is stated in their behalf; the claim of each intervener is set out, including the claims of certain undertakers to whom benefit certificates of deceased members had been assigned; that no payments have been made by the Grand Lodge upon these death claims, except to those including only the name of Rosie Hardy to Hannah McBride were paid 24.7 per cent. of their claims by judgment of the chancery court of Howard county, Arkansas, in 1937, which should be credited thereon; that the Grand Lodge and the Benefit Association required on the death of each certificate holder that proof of death be made and filed with the Grand Lodge and its Benefit Board, together with the orginal Benefit Certificate of the deceased member. This was done in each instance, and these proofs and the original certificates are now in the possession of the Grand Lodge and it should be required to produce them upon the trial. The claims of the interveners were allowed and approved for payment and are due and unpaid.

They alleged that the interveners were enjoined by the circuit court of Crittenden county, on March 11, 1933, from filing any suits on their claims, and this injunction was not dissolved until the 7th of December, 1936; that they should be permitted to intervene herein to avoid a multiplicity of suits and should have judgment for their claims and proper orders of the court for the protection of their interests in the trust property of the Associa-

tion, represented by the deed of trust; that the record title to the Temple property, subject to the deed of trust, is in the plaintiff, Grand Lodge; that subsequent to the enactment of § 4351 to 4357 of Kirby's Digest on May 8, 1899, the Masonic Benefit Association complied with that law and made its annual reports to the State Insurance Department until what is known as the Fraternal Act of 1917 was passed. Section 7854, *et seq.* of Pope's Digest. It then complied with that law and made annual reports to the State Insurance Department up until 1933; that on December 31, 1931, it owed $72,435 unpaid death claims, as shown by reports; that the Masonic Benefit Association, with full knowledge and by authority of the grand lodge and signed by grand lodge officers, filed its power of attorney for service of legal process upon the Insurance Commissioner, in the Insurance Department on October 28, 1919, as required by the Fraternal Act of 1917, § 7876 of Pope's Digest; that the plaintiff, Grand Lodge, on April 17, 1920, filed the same kind of power of attorney for service upon the Commissioner with the Insurance Department.

They alleged that the Grand Lodge and the Benefit Association are estopped to deny that it was a Fraternal Benefit Association under the laws of this state; that the Association became in bad shape in 1930 and subsequent years that it was in business. Several hearings were had on its financial condition, before the Insurance Commissioner, attended by officers of the Grand Lodge and the Association. February 6, 1933, the Insurance Commissioner made a record order directing the Association to appear before the Commissioner and show cause why an order should not be certified to the Attorney General by reason of its impaired and unsatisfactory financial condition. Subsequently the Insurance Commissioner determined the Masonic Benefit Association to be insolvent and directed the Attorney General to proceed in accordance with law for a receivership.

It is further alleged that on March 11, 1933, proceedings were had by the Attorney General in the Crittenden circuit court and J. S. Phelix was appointed receiver and qualified. Thereupon the Association ceased

business and remained in receivership until December 7, 1936, when by order of the Crittenden circuit court the receivership was dissolved and the receiver ordered to deliver all the assets and records in his hands to the treasurer of the Masonic Benefit Association of. the Grand Lodge. This order was carried out.

They alleged that the Grand Lodge adopted by-laws governing the Association and for payment of dues and benefits for death and burial certificates. In 1911 these by-laws were filed and are now on file with the State Insurance Department. In 1927 these by-laws were revised and copies thereof filed with the Insurance Department and are now on file. All dues of the certificate-holders of these interveners were paid and the certificates were in force at the time of their deaths; that section 27 of its by-laws required the Masonic Benefit Board to invest the mortuary or death funds paid by its members in good securities, which were required to be approved by the Insurance Commissioner; that on January 13, 1920, the Grand Lodge filed an amendment to the by-laws with the Insurance Department that required the Mortuary Department and funds to be treated as a separate and distinct society, though in fact it remained under the jurisdiction of the Grand Lodge.

They further alleged that these by-laws provide that the Mortuary Department is created and the Endowment Board authorized to issue benefit certificates with table of rates sufficient to maintain reserves under the American Experience Tables. An application and medical examination is required to accompany the application of each member. The membership and mortuary fund of this department shall be kept separate from all other funds and the books and records of the order shall show at all times the individual total membership and the receipts and disbursements of the mortuary fund, and to that extent such department shall be treated as a separate and distinct society.

That § 4 of these by-laws says: ''All moneys, bonds, mortgages, notes, credits, securities and papers of every kind composing the Mortuary Fund of the

Mortuary Department are hereby declared to be a trust fund, said fund to be held for the sole benefit of those who contribute thereto, and no part thereof to be used for the payment of claims arising among any other members''; that § 5 provides for the mortuary and expense fund, with 75 per cent. of the first year's dues or premium payments to go to expense for the remainder of that year, and thereafter the total amount to be credited to the death or mortuary fund, and "said fund to be used only for the payment of benefits as may be provided in the certificate issued; that these by-laws made further and complete provisions as to juvenile members of the Mortuary Departments and benefits thereto.

They alleged that under the plan of operation and the by-laws, the debt secured by the deed of trust sought to be canceled was a debt due to mortuary fund, which was a trust fund for those who created it as certificate holders and their beneficiaries. As to the allegation in the complaint that Phelix had contrived to defraud the Grand Lodge by the execution of the deed of trust and the commencement of a suit for receivership, the interveners state that such allegations are not true, and the facts are that the State Insurance Department had an examination made of the Association by O. D. Morrow, its examiner, and his report was filed in the Insurance Department. (This report shows transfers from the Mortuary Fund of the Masonic Benefit Association to and for the use of the Grand Lodge, a total sum of $32,112.15).

The intervention further alleges other substantial losses sustained by the insurance division of the Grand Lodge as a result of improvident investments of its funds by the Grand Lodge and further that the Temple building is the only property owned by the Grand Lodge and is now "probably the only property that can be subjected to the payment of the claims due these and other beneficiaries in similar situation. The Temple building is worth far less than the amount of their claims and said Grand Lodge is insolvent and unable to pay its debts and has refused and failed to pay these interveners.''

The prayer of the interveners is that they "be permitted to intervene and defend herein; that plaintiffs take nothing by reason of their complaint; that a new, independent and disinterested trustee be by the court appointed under said deed of trust; that interveners have judgment for the amount of their claims; that an independent and disinterested receiver be appointed for the Temple building and for all properties of the mortuary fund of the Benefit Association, with proper directions from this court to said receiver; that the Grand Lodge be required to account for the funds of the mortuary fund of the said Association; and all other proper and equitable relief."

Following the filing of this intervention, appellees on January 5, 1940, filed a motion, which the trial court treated as a demurrer, to strike and dismiss the intervention for the reason that "the facts alleged in said intervention show that the interveners do not have any right, title, or interest in the property which belongs to the plaintiffs as alleged in the complaint, and therefore have no right to intervene in this action." On the same day, upon a hearing, the learned chancellor sustained appellees' motion and "decreed and adjudged that the said intervention be and the same is hereby struck from the files in this case." This appeal followed.

The question for review here is whether the interveners have in their intervention stated a cause of action such as would entitle them to intervene.

In testing the sufficiency of the intervention of appellants, on demurrer, every allegation contained therein and every reasonable inference deducible therefrom must be considered, and if, when so considered, a cause of action is stated, the demurrer must be overruled. *Dillinger* v. *Pickens.*

From the abstract of the pleadings with which alone we are concerned here, interveners allege that the appellee, Grand Lodge, shortly after it was chartered and incorported as a Masonic benevolent organization, set up an insurance division to engage in insurance for the benefit of its members. If we assume that in so doing

it was without authority, and its actions *ultra vires,* however, it is a fact that for a period of more than thirty years it operated an insurance division under the name of "Masonic Benefit Association," issued benefit insurance certificates to its members and collected from each member dues in payment for these insurance certificates. It is alleged that annual reports were regularly made to the Insurance Commissioner by this insurance division of the Grand Lodge in an effort to comply with the law.

It is further alleged that this benefit association (or insurance division) was required by the by-laws of the Grand Lodge to hold these insurance funds in a separate fund and to be used solely for the payment of death and burial benefits.

It is further alleged that the Grand Lodge without right from time to time dipped into these funds and used them at its pleasure and that finally when called to account and required to secure these funds by the Insurance Commissioner, it did so, by executing sixteen $2,000 notes secured by a deed of trust on the Temple building property in question, naming J. H. Blount as trustee.

We think it clear under the allegations made by interveners that the money collected from the members and set apart for the payment of death benefit claims, if supported by proof, would be a trust fund that could be used only for the purposes for which created and that the trustee under the deed of trust would hold such funds in trust for such purposes. We think it can make no difference that the Grand Lodge might have acted without authority in creating the insurance division and collecting dues from its members in payment for insurance benefits, and that such acts were *ultra vires.* Whether rightfully or wrongfully done, we may infer from the allegations of interveners that the Grand Lodge and all members affected were acting in good faith. The money was collected and set apart for a specific purpose, and as we view it, is a fund in trust for the benefit of these interveners and all other members similarly situated for whom the money was collected.

In *Carr* v. *Harrington,* 107 Ark. 535, 155 S. W. 1166, this court said: "Trusts arise when property has been conferred upon one person and accepted by him for the benefit of the other. In order to originate a trust, two things are essential; first, that the ownership conferred be connected with a right or interest or duty for the benefit of another; and, second, that the property be accepted on these conditions."

In *Clark, Trustee,* v. *Spanley, Trustee,* 122 Ark. 366, 183 S. W. 964, it was said: "It is well settled that trust property, or property substituted for it, may be recovered from the trustee and all persons having notice of the trust. So long as a fund can be distinctly traced the chancellor will follow it and fasten the purpose of the trust upon it unless the rights of innocent third parties have intervened."

It is alleged that the claims due interveners are much in excess of the $32,000 secured by the deed of trust in question and that whatever sum may be eventually realized from the sixteen notes amounting to $32,000, and secured by the deed of trust on the temple building, will be all that may ever be salvaged from the insurance fund.

If the funds in question were trust funds, as alleged, then the statute of limitations cannot defeat the claims of interveners and others similarly situated. In *Roper* v. *Green & Lawrence Drainage District,* 194 Ark. 493, 496, 108 S. W. 2d 584, this court said: "The fund being a trust fund and the directions being specific as to how it should be paid to the bondholders by the directors, a fiduciary relationship existed and it was clearly a fund, as long as it was in the hands of the directors or under their control, the payment of which could not be defeated by the statute of limitations. The general rule is that the statute of limitations cannot be interposed to defeat an express trust. We deem this question so well settled that it is unneccessary to cite the large number of cases so holding." In fact limitations could not run against the interveners, and others similarly situated, for the death claims accruing in 1931 and 1932 for the reason that claimants were enjoined from suing by the Critten-

den circuit court in March, 1933, and this injunction was not dissolved until December, 1936.

Neither may laches or estoppel be interposed by one holding property as trustee. *Gantt* v. *Arkansas Power & Light Company*, 194 Ark. 925, 109 S. W. 2d 1251.

We conclude, therefore, that the learned chancellor erred in sustaining the demurrer to the intervention of appellants and accordingly the decree is reversed and the cause remanded with directions to overrule the demurrer and to proceed in accordance with the principles of equity and not inconsistent with this opinion.